# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| **SANDRA FARINACCI,** *et al.* | : | **Case No. 08-CV-1355** |
| **Plaintiffs,** | : | |
|  | : | **JUDGE KATHLEEN O'MALLEY** |
| **v.** | : | |
| **CITY OF GARFIELD HEIGHTS,** *et al.* | : | **OPINION & ORDER** |
| **Defendants.** | : | |

Before the Court is a Motion for Summary Judgment (Doc. 51), pursuant to Federal Rule of Civil Procedure 56, filed by the Defendants, the City of Garfield Heights ("the City"), William Wervey, Mike Kristof, John Berdysz, Brad Buntura, John Becony, Tim McLaughlin, and "John Doe" (collectively, the "Defendants").[1]  The Plaintiffs, Sandra and Kim Farinacci (collectively, the "Plaintiffs"), have filed an opposition brief (Doc. 59), and the Defendants have filed a brief in reply (Doc. 62).  Accordingly, this matter is ripe for adjudication.  For the reasons articulated below, Defendants' Motion for Summary Judgment (Doc. 51) is **GRANTED** in its entirety.

---

[1]The Defendants have also asked that the John Doe defendant listed in the First Amended Complaint (Doc. 38) be dismissed pursuant to Federal Rule of Civil Procedure 4(m).  (Doc. 51 at 1.)  Rule 4(m) states, "[i]f a defendant is not served within 120 days after the complaint is filed, the court . . . must dismiss the action without prejudice against that defendant . . . But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period."  Fed. R. Civ. P. 4(m).  The First Amended Complaint (Doc. 38) was filed on February 3, 2009, and the John Doe defendant has not been named nor served with the complaint as of the date of this Order.  In their response brief, Plaintiffs raise no objection and do not assert any good cause for their failure to serve within the 120-day window.  (Doc. 59.)  Accordingly, Defendants' motion to dismiss the John Doe defendant is well-taken and is **GRANTED**.  The John Doe defendant is **DISMISSED** from this action without prejudice.

## I.    BACKGROUND

This case arises out of the fact that certain City of Garfield Heights' officials entered a house owned by Sandra Farinacci and the fact that the Plaintiffs' pet cats living at the house died within several months thereafter. (Doc. 38.)  In short, Plaintiffs allege that the City disregarded their rights and killed their cats.  Although certain disputed facts will be discussed below, unless otherwise noted, the facts that follow are undisputed.

### A.    FACTUAL HISTORY

Plaintiff Sandra Farinacci lived at 10520 Mountview Avenue in Garfield Heights, Ohio ("the property") for approximately 37 years. (Doc. 59-1 at 1.)  Her daughter, Plaintiff Kim Farinacci, last lived on the property in June 2006. (Doc. 59-1 at 3.)  In January 2006, Sandra Farinacci fell into default on her mortgage for the property (Doc. 51-4 at 2), and foreclosure proceedings began in December of that year.  On February 21, 2007, Sandra Farinacci moved off of the property and, since that date, no person has lived in the house. (Doc. 59-1 at 1-2.)[2]

The Bank of New York Trust Co. ("the bank") holds the mortgage on the property as trustee, and Select Portfolio Servicing, Inc. ("SPS") is the bank's servicing agent. (Doc. 51-4 at 1.)  The mortgage contains the following provisions:

> Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property . . . If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property.  Lender's actions may include paying any sums secured by a lien which has priority over this Security

---

[2]Kim Farinacci asserts that Sandra Farinacci's poverty, along with her physical and mental illnesses, forced her from the property.  (Doc. 59-1 at 3.)

Instrument, appearing in court, paying reasonable attorneys' fees and <u>entering on the property</u> to make repairs.

(Doc. 51-4 at 11 (emphasis added)).  SPS contracted with Fidelity National Field Services, Inc., who hired James Secure, Inc. to perform property preservation services on the property, pursuant to the mortgage provisions. (Doc. 51-6 at 1.)

In April 2007, James Secure employees inspected the property and found the house empty, with no heat or electricity, and with numerous cats roaming throughout the house.[3] (Doc. 51-6 at 1.) Much of the house contained cat feces, urine, and raw garbage. *Id.*  Rayfield James, Jr. of James Secure stated that, the "property was by far in the worst condition of any I have ever seen with respect to health and safety hazards, raw garbage, feces and urine." *Id.*  As part of the property preservation efforts, James contacted Tim McLaughlin, City Service Director for the City of Garfield Heights ("the City"), in early April 2007 and asked for the City's assistance in removing the cats from the property. (Doc. 51-13 at 1.)  While Plaintiffs argue that McLaughlin did not obtain Mr. James' name or the exact company he was representing at that time, the only evidence in the record on this point is that McLaughlin obtained James' name when James called the City and provided it to other City employees shortly thereafter.[4] (Doc. 59 at 2.)  It is undisputed, however, that neither McLaughlin nor any other City employee called either the Bank or the Farinacci's to verify the caller's authority with respect to the property. (Doc. 59-1 at 9.)

---

[3]Whether the house was unsecured at this point or, as Plaintiffs contend, the doors were locked is a disputed fact.  The Court does not find that fact material to its analysis, however.

[4]As Defendants explain, "McLaughlin testified that he did not remember the name, not that he never knew it, and Mr. Buntura testified that he had the name on file at the time, but no longer." (Doc. 62 at 2.)

-3-

Following the phone call, McLaughlin notified the City Foreman, John Becony, of the situation at the Farinacci property. (Doc. 38 at 4.)  The City Animal Warden, Brad Buntura, was subsequently informed. *Id.*  Buntura, John Berdysz, a service department employee, and Mike Kristof, the current Animal Warden, then went to the house and observed the cat situation.  Buntura and Berdysz entered the house on April 5, 2007 and placed five live cat traps inside, attempting to catch and remove the animals. (Doc. 59 at 3.)  Kim Farinacci went to the house later that same day, discovered the traps inside, freed the cats who were in them, and then removed the traps from the home. (Doc. 59-1 at 4.)  On April 6, 2007, Buntura and Berdysz returned to the house to find that at least some of the traps had been taken, and they reported that fact to the City's police department, who filed a theft incident report. (Doc. 59-1 at 25-26.)  Also, on April 6, William Wervey, the City's Building Commissioner, wrote a letter to the Cuyahoga County Court of Common Pleas, stating as follows:

> As the Building Commissioner of the City of Garfield Heights, I am familiar with the property located at 10520 Mountview, . . . that is the subject of the above referenced foreclosure case.  It is my opinion that this property is vacant and abandoned and is having a negative impact on the surrounding neighborhood.  On behalf of the City of Garfield Heights, I request that the above referenced case be expedited through the foreclosure process.

(Doc. 59-1 at 41.)  Plaintiffs frame this letter as a "declaration" by Wervey that the house was vacant and abandoned. (Doc. 38 at 6.)

Kim Farinacci claims that, following these April events, she went to the house regularly to feed the cats, but in July, she "entered the home to find all of the cats which a day or two before appeared healthy, to be dead."  (Doc. 59-1 at 4.)[5]

_____

[5]Sandra Farinacci asserts that she took two of the cats to live with her in her new apartment, but left the others behind. (Doc. 59-1 at 1.)  It is unclear how many cats were left at the empty Mountview property when Sandra Farinacci moved out in February 2007, and it is

### B.    PROCEDURAL HISTORY

This case originated in the Cuyahoga County Court of Common Pleas on May 5, 2008, but was removed to federal court on June 4, 2008. (Doc. 1.)  Plaintiffs filed their First Amended Complaint on February 3, 2009, asserting the following counts:

I.      Violation of 42 U.S.C. §1983 by the City and Wervey for violating Procedural Due Process;

II.     Violation of 42 U.S.C. §1983 by the City, Becony, Buntura, Kristof, McLaughlin, and Berdysz for violating the Fourth Amendment;

III.    Ohio state law Trespass by all Defendants;

IV.     Ohio state law Invasion of Privacy by all Defendants; and

V.      Ohio state law Intentional Infliction of Emotional Distress by all Defendants.

(Doc. 38.)  Defendants have moved for summary judgment as to all counts. (Doc. 51.)

## II.    LAW AND ANALYSIS

### A.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Defendants have moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. (Doc. 51.)  Under Rule 56(c), summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

---

unclear whether the same number of cats were later found dead at the property.  While Kim Farinacci asserts that it appeared to her that three cats went missing between February of 2007 and the events in April, she is not sure or precise on this point and does not attribute their departure to the Defendants, or anyone else.  (Doc. 59-1 at 4.)  She also does not specify the number of cats there as of any point in time – February, April, or July.

In reviewing summary judgment motions, this Court must view evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008).  A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008).  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards.  Thus, in most civil cases, the Court will decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Anderson*, 398 U.S. at 252.

Upon filing a motion for summary judgment, the moving party has the initial burden of establishing that there are no genuine issues of material fact as to an essential element of the non-moving party's claim. *Moldowan v. City of Warren*, 570 F.3d 698, 719 (6th Cir. 2009); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 & n.12 (6th Cir. 1989).  The moving party, however, is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the moving party relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Curto v. Harper Woods*, 954 F.2d 1237, 1241 (6th Cir. 1992) (quoting *Ceolotex*, 477 U.S. at 322); *Ocean Innovations, Inc. v. Quarterberth, Inc.*, No. 1:03-CV-0913, 2009 U.S. Dist. LEXIS 54108, at *8-9 (N.D. Ohio June 26, 2009) (citing *Ceolotex*, 477 U.S. at 322).

In response, if the moving party establishes the absence of a genuine issue of material fact, to defeat summary judgment, the non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule –

set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  In this regard, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment"; rather, "Rule 56 allocates that duty to the opponent of the motion, who is required to point out the evidence, albeit evidence that is already in the record, that creates an issue of fact." *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379-80 (6th Cir. 2007) (citation omitted).  The non-moving party must show more than a scintilla of evidence, moreover, to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87; *see also Barr v. Lafon*, 538 F.3d 554, 574 (6th Cir. 2008).

Accordingly, the ultimate inquiry is whether the record, as a whole, and upon viewing it in the light most favorable to the non-moving party, could lead a rational trier of fact to find in favor of the non-moving party.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87; *see also Anderson*, 477 U.S. at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict – whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.") (emphasis in original) (internal quotations omitted).

**B.    DISCUSSION**

In order to resolve Defendants' motion for summary judgment, the Court will address each of the Plaintiffs' claims in turn.

1.    **Federal Claims under 42 U.S.C. §1983: Procedural Due Process &
Fourth Amendment**

Plaintiffs claim that William Wervey, the City's Building Commissioner, violated their procedural due process rights under the Fourteenth Amendment by "declaring" the 10520 Mountview Avenue property to be vacant and abandoned without following an applicable City ordinance.  (Doc. 38 at 6.)  Plaintiffs assert that, before a house can be deemed "vacant," the City must give the property owner 30-days notice (Doc. 59-2), and that Wervey did not follow that procedure.  (Doc. 38 at 6.)  They also allege a *Monell* claim[6] against the City for having a "custom and practice of declaring residential homes abandoned and vacant without following applicable city ordinances."  *Id.*

The second §1983 claim asserted is that John Becony, Brad Buntura, Mike Kristof, Tim McLaughlin, and John Berdysz violated the Fourth Amendment by entering Plaintiffs' house without a warrant and purportedly without proper consent.[7]  They also assert a *Monell* claim against the City based on an alleged custom and practice of City officials entering homes in violation of the Fourth Amendment.[8]

---

[6]"[B]efore a local government can be held liable for injuries under section 1983, . . . a plaintiff must show that his injuries were the result of some 'policy or custom' attributable to the governmental entity."  *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1245 (6th Cir. 1989) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)).

[7]Defendants argue that only two of the individual defendants actually entered the house. (Doc. 51-1 at 7.)  They ask the Court to dismiss the Fourth Amendment claims against the other individual defendants who did not physically enter Plaintiffs' house.  Given the Court's other conclusions, the Court need not reach this issue.

[8]The Plaintiffs do not allege any §1983 violation based on the deaths of their cats.  (Doc. 38.)  The only claims premised upon the deaths of the cats are two state law claims, Counts 3 and 5.  (Doc. 38 at 9; Doc. 59 at 13.)

All Defendants assert that no City officials committed any constitutional violations, under either the Due Process Clause, the Fourth Amendment, or otherwise. (Doc. 51-1 at 5-7.)  The City also contends that Plaintiffs have offered no evidence demonstrating a City policy or custom to violate the constitutional rights of the City's homeowners.  (Doc. 51-1 at 8-9.)

The Court undertakes a two-stage analysis for both claims.  First, it must assess whether the individual Defendant officials are qualifiedly immune – which, as explained below, involves determining: (a) whether the officials violated a constitutional right and (b) whether that right was clearly established.  Next, if it concludes the City officials did violate a constitutional right (whether or not clearly established), the Court must determine whether that conduct was the result of a City "policy or custom."  Where no constitutional violation occurred, there can be no *Monell* claim against the City, regardless of its policies.

### a.  Qualified Immunity

To sustain a claim under §1983, a plaintiff must "establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under color of state law."  *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006) (omitting citations).  Even where these elements can be established, however, when applicable, the doctrine of qualified immunity protects government officials from §1983 claims.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Thomas v. Cohen*, 304 F.3d 563, 568 (6th Cir. 2002).  In general, government officials are shielded from liability by qualified immunity when performing discretionary functions that do "not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known."  *Harlow*, 457 U.S. at 818.

The goal of qualified immunity is to "avoid excessive disruption of government" by protecting public officials' ability to exercise their discretion without undue fear of civil liability. *Id.* When a government official invokes qualified immunity, the burden is on the plaintiffs to demonstrate that the official is *not* immune. *See Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court established a two-prong test to assess the availability of qualified immunity for claims arising under §1983. First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201. Second, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* A motion for summary judgment on qualified immunity grounds must be granted unless the plaintiff can satisfy both prongs of the *Saucier* test.[9] While the Supreme Court recently

---

[9]The Sixth Circuit, at times, has broken the two-prong *Saucier* test for qualified immunity into three-prongs:

> First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence "to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights."

*Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (quoting *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc) (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir.1996))). As the Sixth Circuit explained in *Sample v. Bailey*, 409 F.3d 689, 696 n.3 (6th Cir. 2005), the first two steps mirror the two prongs of the *Saucier* test, and the third prong acknowledges the reasonableness requirement that is implicit in the clearly established prong described in *Saucier*. Judge Karen M. Moore clearly prefers the three-prong approach. *Myers v. Potter*, 422 F.3d 347, 358-59 (6th Cir. 2005) (Moore, J., concurring). Other panels have held that the three-step test is correct, but unnecessary in most cases, because "[i]n many factual contexts . . . the fact that a right is 'clearly established' sufficiently implies that its violation is

-10-

explained that the sequence of resolving prong one first, followed by prong two, is no longer mandatory, *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009), the Court finds it appropriate to address prong one first in this case.

Under the first prong of *Saucier*, the district court must determine whether the defendant's conduct violated a constitutional right. 533 U.S. at 201. In making this determination, the Court must construe the evidence in the light most favorable to the plaintiff. *Id*. Therefore, even if the facts are disputed, if the plaintiff's version of the facts does not rise to the level of a constitutional violation, then the first prong has not been satisfied and qualified immunity applies. *See Turner v. Scott*, 119 F.3d 425, 428 (6th Cir. 1997). With this in mind, the *Saucier* directive to construe the evidence in the light most favorable to the plaintiff has particular significance when (1) there are disputed issues of fact, and (2) whether a constitutional violation occurred hinges on which version of the facts is accepted. That is, when the plaintiff's evidence, viewed in the most favorable light, amounts to a constitutional violation, prong one of the *Saucier* test is satisfied *even if the facts pertinent to the alleged constitutional violation are disputed*. *See id*.

---

objectively unreasonable." *Causey v. City of Bay City*, 442 F.3d 524, 528 n.2 (6th Cir. 2006). In this case, the Court finds that the latter approach is sufficient. If it becomes necessary for the Court to address the second prong of the *Saucier* test, a discussion of the reasonableness of the officials' conduct will be incorporated then. Furthermore, this Court believes the two-prong approach to be particularly appropriate in cases, such as this one, in which neither party addresses the three-prong approach in briefing. *See Chappell v. City of Cleveland*, 584 F. Supp. 2d 974, 989 n.16 (N.D. Ohio 2008).

           **i.**      **Count 1: Whether Wervey's Conduct Violated Procedural Due Process**

Under the Due Process Clause of the Fourteenth Amendment, "no State shall deprive . . . any person of life, liberty, or property, without due process of law." U.S. Const. Amend 14.  In the Sixth Circuit,

> a § 1983 plaintiff may prevail on a procedural due process claim by either (1) demonstrating that he is deprived of property as a result of established state procedure that itself violates due process rights; or (2) by proving that the defendants deprived him of property pursuant to a "random and unauthorized act" and that available state remedies would not adequately compensate for the loss.

*Macene v. MJW, Inc.*, 951 F.2d 700, 706 (6th Cir. 1991) (internal citation omitted).  In assessing whether Wervey's act of sending the letter violated procedural due process, the Court must determine (1) whether the property interest Plaintiffs assert is constitutionally protected and (2) if the right is protected, whether Wervey's conduct deprived the Plaintiffs of that interest in violation of due process.[10]  *Thomas v. Cohen*, 304 F.3d 563, 576 (6th Cir. 2002).

Sandra Farinacci asserts that she was deprived of her right to exclude others from her property.  She claims that Wervey's letter to the Common Pleas Court, stating that the Farinacci house was "vacant and abandoned," violated the City Ordinance requiring that property owners be given thirty days notice to challenge vacancy determinations.  (Doc. 38 at 6 (citing Doc. 59-2)).  Sandra Farinacci contends that, if she had been given 30-days notice, she would have exercised her right to exclude others and prevented the City officials from entering her home.

_____

[10]Defendants argue that only Sandra Farinacci, not Kim Farinacci, has asserted a procedural due process claim in this matter.  Defendants' reading of the complaint is correct.  (Doc. 38 at 6-7.)  If Kim Farinacci had asserted a due process claim, qualified immunity would bar it for the same reasons her mother's claim is barred.

Defendants counter that Wervey's letter was not a "declaration" that the house was vacant; it was merely an "opinion" sent in response to a request from the Common Pleas Court that the City identify vacant properties for fast-track foreclosure proceedings.  (Doc. 51-1 at 6; Doc. 62-1 at 5.) Thus, Defendants contend that, even if the City Ordinance could create a protectable property interest in some circumstances, that interest was not triggered in this case.  Defendants also assert a "causation" defense: that Wervey's letter had "absolutely nothing to do with the request for assistance in removing the cats from the Property." *Id.*  In other words, Defendants argue that Wervey's conduct was not the but-for cause of any alleged deprivation of Plaintiffs' property rights – i.e., even without the letter, all of the alleged harm would still have occurred.  Consequently, no constitutional violation could arise from the fact that Wervey sent the letter.

It is clear that the property interest asserted – the right to exclude others from one's property – is a constitutionally protected property interest.  *Rakas v. Illinois*, 439 U.S. 128, 143 (1978) ("One of the main rights attaching to property is the right to exclude others" (citing *see* W. Blackstone, Commentaries, Book 2, ch. 1)).  The Court turns, accordingly, to the second inquiry – whether Wervey's actions deprived Sandra Farinacci of that property interest without due process. *Thomas*, 304 F.3d at 576.

It is true that a City official lacks legal authority if he or she acts in contravention of applicable city ordinances.  *See Antonian v. City of Dearborn Heights*, 224 F. Supp. 2d 1129, 1144 ( E.D. Mich. 2002) (Defendant had the plaintiff's house demolished without giving 20-days notice as required by the City ordinance, and accordingly, acted without legal authority and was potentially liable for trespass).  In order for there to be a violation of due process, however, the official's conduct must be the "proximate cause" of the property deprivation.  *See Sell v. City of Columbus*,

-13-

47 Fed. Appx. 685, 693 (6th Cir. 2002) (unpublished) (If the official's action was not duly authorized, then "the district court must consider on remand whether the City's custom and policy of allowing unauthorized officials to order emergency evictions was a proximate cause of the alleged deprivation of plaintiffs' due process rights." (emphasis added)).

The City ordinance upon which Sandra Farinacci premises her due process claim is Chapter 1371 of the City of Garfield Heights Building Code. (Doc. 59-2.) That ordinance creates a procedure by which the City may deem a property vacant, board it up, and undertake exterior landscaping at the owner's expense. *Id.* As Plaintiffs note, that ordinance contains certain notice requirements – including the obligation to post a "Notice of Vacancy" on the property at least thirty days prior to taking steps to secure or maintain the property. As Plaintiffs further note, moreover, there is no dispute that the City did not follow the notice requirements of Chapter 1371 as it relates to the Mountview Avenue property owned by Sandra Farinacci.

The mere failure to follow these notice requirements does not, however, compel the conclusion that Sandra Farinacci was thereby deprived of a property right. While, as noted, it is clear that no "Notice of Vacancy" was ever posted on the Mountview property, there is nothing in the record to indicate that the City ever exercised any of the authority over the property granted to it under Chapter 1371. Specifically, there is no evidence that the City boarded up the property or landscaped it at Sandra Farinacci's expense.[11] Where the City does not purport to act pursuant to authority granted to it by ordinance, any prerequisites to acting simply need not be followed and a due process claim cannot be premised on the failure to do so.

---

[11]While Plaintiffs' opposition brief claims in a footnote that the City threatened to "cut the grass" at Sandra Farinacci's expense (Doc. 59 at 6 n.3), there is nothing in the record to support that claim.

Sandra Farinacci attempts to avoid the logic of this conclusion by pointing to Wervey's letter to the Common Pleas Court and characterizing it as a "declaration" of vacancy which, she contends, gave rise to both the City's rights and its obligations under Chapter 1371. There are two weaknesses in her argument however: (1) she mischaracterizes the purpose and effect of Wervey's letter, and (2) there is no connection between the letter and the harm she claims to have suffered.

Wervey sent a letter to the Common Pleas Court which was adjudicating Sandra Farinacci's property foreclosure, advising the Court that he believed the Mountview property was vacant and asking that the foreclosure proceedings relating to the property be expedited. Plaintiffs do not dispute that this letter was written in response to a request from the Common Pleas Court, asking municipalities to identify vacant properties in their environs so that the foreclosure proceedings as to those properties might be "fast-tracked" (Doc. 62-1 at 5). Plaintiffs also do not dispute that Wervey's letter followed the form suggested by the Common Pleas Court, which asked for an opinion as to the vacant status of properties in foreclosure, not for a formal or official declaration thereof. Finally, Plaintiffs do not dispute and the record is clear that, upon receipt of letters like the Wervey letter, the Common Pleas Court employed a procedure by which it notified the property owners of the fact that their properties were being treated as vacant ones, and giving the property owners the opportunity to object to that designation (Doc. 62-1 at 5) – the very notice and opportunity Sandra Farinacci claims to have been entitled under Chapter 1371. There simply is no support in the record, accordingly, for Sandra Farinacci's assertion that Wervey's letter constituted a legally binding declaration of her rights.

As Defendants point out, moreover, there is no factual, casual link between Wervey's letter and Sandra Farinacci's claimed constitutional deprivation. The City entered the property before the

-15-

letter was even sent and well before the Common Pleas Court had the chance to take any action in response to it. (Doc. 59 at 3; Doc. 59-1 at 41.)  Thus, the entry onto the premises, which Sandra Farinacci says she would have prohibited if given the chance to object to the conclusions in Wervey's letter, occurred before any notice period could have been triggered.  The City did not, moreover, rely on the letter as its authority to enter the premises; the City entered at the request of the mortgage holder and its agents (Doc. 51-13 at 1).

For these reasons, it is clear both that Wervey's letter did not violate Chapter 1371 of the City's ordinances and that Wervey's conduct was not the proximate cause of any property deprivation.  Because Plaintiffs cannot show that Wervey committed any constitutional violation, their claim against him fails at prong one of the *Saucier* analysis.  The Court, accordingly, need not address prong two.  William Wervey is, thus, entitled to qualified immunity with respect to Count 1 and summary judgment is **<u>GRANTED</u>** to him on that count.

### ii.    Count 1: Procedural Due Process: the *Monell* claim

Because William Wervey did not violate Plaintiffs' procedural due process rights, the City cannot be liable for a *Monell* claim under Count 1.  *See Blackmore v. Kalamazoo County*, 390 F.3d 890, 900 (6th Cir. 2004) (citing *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986) (A city "cannot be liable under § 1983 absent an underlying constitutional violation by its officers.") Therefore, summary judgment is **<u>GRANTED</u>** to the City on Count 1.

### iii.    Count 2: Whether Defendants' Conduct Violated the Fourth Amendment

The Plaintiffs' second claim is that the individual Defendants violated the Fourth Amendment by entering their house without a warrant and without proper consent. (Doc. 38 at 7-9.) In response, Defendants argue that the individual City officials are entitled to qualified immunity

because they did not commit a Fourth Amendment violation. (Doc. 51-1 at 7.)  In particular, the individual Defendants assert that Rayfield James provided valid third-party consent for them to enter Plaintiffs' house via the property preservation provisions in Sandra Farinacci's mortgage.  *Id.*  The City argues, moreover, that it cannot be liable under *Monell* because (1) there was no underlying constitutional violation by its officials, (2) there is no City policy or custom that was the moving force behind any constitutional violation, and (3) Plaintiffs cannot show any purported "failure to train" demonstrating a "deliberate indifference" by the City to the rights of its homeowners.[12]  (Doc. 51-1 at 8-9.)

  To resolve this qualified immunity issue, the Court must determine whether the individual Defendants violated the Fourth Amendment, which states in pertinent part that, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . ."  U.S. Const. Amend. 4.  It is undisputed that no search warrant was obtained and that the Plaintiffs never directly gave the Defendants permission to enter their home.  (Doc. 38 at 7-8.)  If the Defendants, nevertheless, obtained proper "third-party consent" to enter Plaintiffs' house, no Fourth Amendment violation will have occurred.  *U.S. v. McCauley*, 548 F.3d 440, 446 (6th Cir. 2008) (citing *U.S. v. Matlock*, 415 U.S. 164, 171 (1974)).

  The issue, therefore, is whether James Secure, Inc. had authorization to give third-party consent and did properly give such consent to the individual Defendants.  On this point, there is no dispute that Plaintiffs had no contract with either property preservation company – Fidelity National

---

  [12]Defendants also assert that Kim Farinacci has no standing to raise any Fourth Amendment claim because she has no reasonable expectation of privacy in her mother's house – a place where she had not lived for almost a year. (Doc. 62 at 5.)  The Court need not address this argument, however, because, even assuming that Kim Farinacci has standing to raise a Fourth Amendment claim, that claim must be dismissed for the same reasons her mother's claim fails.

Field Services, Inc. or James Secure, Inc.  The only contractual relationship was through Sandra Farinacci's mortgage with the bank and with SPS as the bank's servicing agent.  Plaintiffs do not dispute the validity of the property preservation provisions in the mortgage, nor disagree that those provisions authorize the bank and SPS to enter the premises and do "whatever is necessary to protect the value of the property" under the circumstances identified.  Plaintiffs merely contend that, while the bank or SPS could both take such actions and authorize its agents to do so, under the mortgage provisions, no one else, including Fidelity or James Secure, had that authority. (Doc. 59 at 6-7.)  In support of this contention, Plaintiffs highlight the following dialogue in Dennis Cook's[13] deposition:

> Q:    Does SPS have authority to permit other people to enter a borrower's home that's in foreclosure but that foreclosure's not yet completed?
>
> A:    We would only grant our property preservation contractors or the agents through Fidelity permission.  I would think that if the police called and they had some kind of emergency situation at the property we would.  In general, we wouldn't grant an unrelated third party permission to enter into the property, no.

(Doc. 59-1 at 49.)  Based on this exchange, Plaintiffs argue that the City lacked proper third-party consent because the only person from whom they received consent – Rayfield James of James Secure – was not authorized to give it.

Defendants counter this argument on two-levels.  First, they recharacterize Dennis Cook's deposition, stating:

> Mr. Cook testified that his company would grant permission to enter to "our property preservation contractors or the agents through Fidelity," and that they would not "grant an **unrelated** third party permission to enter…." Plaintiffs' Exhibit L at 85 (emphasis added).  In the present case, the City was not unrelated, because James Secure, Inc. requested the City to enter the House.

---

[13]Dennis Cook is a representative of SPS.

-18-

(Doc. 62 at 5-6 (emphasis in original)).  Thus, Defendants argue that, because James was a property preservation specialist for SPS, he had actual authority to give third-party consent.  Second, even assuming *arguendo* that James had no authority under the mortgage to give consent, Defendants argue that they were permitted to act upon their reasonable, even if erroneous, belief that James had authority to consent – citing *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (The warrant exception for consent "extends even to entries and searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant," but not where an occupant is physically present and objecting to that entry).

In order for James Secure to have proper authorization to give consent, it must have possessed either actual or apparent authority over the house.  *U.S. v. Purcell*, 526 F.3d 953, 962 (6th Cir. 2008) (citing *U.S. v. Caldwell*, 518 F.3d 426, 429 (6th Cir. 2008)).  Third-parties who possess "'common authority over or other sufficient relationship to the premises or effects sought to be inspected'" may give valid consent.  *McCauley*, 548 F.3d at 446 (quoting *Matlock*, 415 U.S. at 171); *cf. Purcell*, 526 F.3d at 962 ("Actual authority in third-party consent cases 'rests . . . on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the [property] to be searched.'" (quoting *Matlock*, 415 U.S. at 171 n.7)).

When Sandra Farinacci signed her mortgage, which included the property preservation provisions, she expressly assumed the risk that, if it became necessary to preserve the property, the bank might permit its agents and others to enter the house to effectuate that purpose.  *See Purcell*, 526 F.3d at 962.  The bank and SPS, who Plaintiffs concede had actual authority to both enter the

-19-

home and give third-party consent to others to do so, delegated that authority to Fidelity and James Secure so that they could carry-out their property preservation duties.  Dennis Cook's deposition, in fact, lends credence to this conclusion.  Cook specifically stated that SPS would grant "our property preservation contractors or the agents through Fidelity" permission to enter the property (Doc. 59-1 at 49), and that is exactly what SPS did – it delegated to James Secure the authority to enter the property.

Thus, James Secure, acting in its property preservation role, had common authority over the house and a sufficient relationship to the premises to give valid consent. *See McCauley*, 548 F.3d at 446.  James Secure then acted within its scope of authority to preserve the Farinacci property: it requested Defendants' assistance in removing the cats whose presence was causing damage to the property and to the bank's interests under the mortgage, giving the City third-party consent to enter the house. (Doc. 51-13 at 1.)  Because James Secure explicitly asked the City officials for assistance, the City was not an "unrelated" party in this matter, as Plaintiffs assert.  Accordingly, Defendants had valid third-party consent by virtue of James Secure's request.[14]

Because Defendants had third-party consent to enter the house, no Fourth Amendment violation occurred and, thus, *Saucier*'s first prong has not been satisfied.  Consequently, the Court need not consider prong two, and Defendants are entitled to qualified immunity with respect to the

---

[14]Plaintiffs contend that, even if Rayfield James was authorized to consent to entry into the home, no one from the City ever confirmed that fact. (Doc. 59-1 at 9.)  Plaintiffs argue that it was reckless to accept Mr. James' claimed authority at face value.  Because the Court concludes that Mr. James did, in fact, have authority to give third-party consent to enter the Mountview property and that he did give such consent by calling the City for assistance in removing the cats from the property (Doc. 51-13 at 1), it is not relevant whether the City confirmed that authority when given.

Fourth Amendment claims.[15]  Defendants' motion for summary judgment is, accordingly, **GRANTED** to all individual Defendants on Count 2.

### iv.    Count 2: Fourth Amendment: the *Monell* claim

As explained above, a *Monell* claim cannot persist against a city if there has been no underlying constitutional violation by one of the city's officials.  *Blackmore*, 390 F.3d at 900.  Because no Fourth Amendment violation occurred, the City cannot be liable under *Monell* on Count 2.  Accordingly, summary judgment is also **GRANTED** in favor of the City as to Count 2.

### 2.    State Law Claims[16]

Plaintiffs assert three Ohio state law claims – trespass, invasion of privacy, and intentional infliction of emotional distress – arising from the Defendants' entry into the Plaintiffs' house and the alleged poisoning of the Plaintiffs' cats.  (Doc. 38 at 9-12.)  As addressed below, Defendants assert specific arguments as to each claim, but rely primarily on state law statutory immunity.

### a.    Statutory Immunity for the City

The City asserts that it has statutory immunity pursuant to Ohio Revised Code §2744.02(A)(1), which states:

---

[15]Because James Secure had actual authority to give consent, the Court need not address Defendants' second argument based on their reasonable belief that such authority existed.

[16]In light of the Court's dismissal of all the Plaintiffs' federal claims, the Court could decline to exercise supplemental jurisdiction over the remaining state law claims. 28 U.S.C. §1367(c)(3); *Blakely v. U.S.*, 276 F.3d 853, 863 (6th Cir. 2002).  The Court may retain jurisdiction even where all federal claims have been dismissed, however, if to do so serves the interest of judicial efficiency.  *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966); *Blakely*, 276 F.3d at 863.  The Court finds that it does.  The Court is familiar with the facts and issues in this case because it has been pending before the Court since 2008.  The parties have briefed all the issues and the record on them is complete.  Judicial efficiency favors retaining jurisdiction to resolve the pending dispositive motions on all claims.

> Except as provided in division (B) of this section, a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function.

O.R.C. §2744.02(A)(1).  Plaintiffs do not counter this assertion of statutory immunity by the City. In their response brief, Plaintiffs assert that the "individual defendants are not immune," but they make no specific reference to the City.  (Doc. 59 at 10.)  The Court cannot, however, simply grant summary judgment on this issue because it is unopposed; the motion must be well-taken.

Looking at the §2744.02(B) exceptions to political subdivision statutory immunity, the only exception that is potentially applicable here is "negligent performance of acts by their employees with respect to proprietary functions of the political subdivisions."  O.R.C. §2744.02(B)(2) (emphasis added).  Entering a citizen's home to protect and preserve the property and removing cats that are a potential public health hazard are not proprietary functions, however; they are governmental functions.  *See* O.R.C. §2744.01(C)(2)(b) (Governmental functions include, but are not limited to, the power to "prevent, mitigate, and clean up releases of oil and hazardous and extremely hazardous substances . . .; and to protect persons and property. (emphasis added)); *see also City of Akron ex rel. Christman-Resch v. City of Akron*, 159 Ohio App. 3d 673, 687 (Ohio Ct. App., Summit County 2005) ("The City's trapping of any cat found running at large, therefore, equates to a law enforcement function, and immunity attaches under R.C. 2744.02(A)(1)." (internal citation omitted)); *cf. Zageris v. Whitehall*, 1992 Ohio App. LEXIS 6725, at *17-18 (Ohio Ct. App., Franklin County Dec. 29, 1992) ("The decision to enter a person's property and to remove their property" is "properly viewed as a governmental function.").  While perhaps one can debate the propriety of the actions of the City employees, there can be no debate that those actions were pursuant to a

"governmental" function; therefore, no exception to the City's state law statutory immunity is applicable.

Statutory immunity, thus, shields the City from liability as to all three state law claims. Accordingly, this unopposed portion of the motion is well-taken and summary judgment is **GRANTED** to the City on Counts 3, 4, and 5.

### b.    Statutory Immunity for the Individual Defendants

The individual Defendants assert state law statutory immunity pursuant to Ohio Revised Code §2744.03(A)(6), which reads:

> In addition to any immunity or defense referred to in division (A)(7) of this section . . ., the employee is immune from liability <u>unless</u> one of the following applies: (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities; (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or <u>reckless</u> manner; (c) Civil liability is expressly imposed upon the employee by a section of the Revised Code.

O.R.C. §2744.03(A)(6)(a)-(c) (emphasis added).

In response, Plaintiffs assert that statutory immunity is inapplicable here because the second exception applies – i.e., the individual Defendants' actions were "reckless."  (Doc. 59 at 10-12.) "Recklessness" is the only exception asserted by the Plaintiffs and the Court agrees that it is the only exception potentially applicable here.  Therefore, in order to determine whether statutory immunity shields the individual Defendants from liability, the Court must assess whether there is a genuine issue of material fact regarding the "recklessness" of each individual Defendant.  If statutory immunity is inapplicable, the Court will then address the merits of the underlying state law claims to determine whether summary judgment is nevertheless warranted.

With respect to the statutory "recklessness" exception, an official's conduct is reckless if he "does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent." *O'Toole v. Denihan*, 118 Ohio St. 3d 374, 386 (2008) (internal citation omitted). At its core, recklessness is "a perverse disregard of a known risk," *id.*, and requires something more than mere negligence. *Fabrey v. McDonald Village Police Dep't*, 70 Ohio St. 3d 351, 356 (1994).

In general, the issue of recklessness is a jury question. *See id.*; *Doe v. Jackson Local School Dist.*, 2007 Ohio 3258, P38 (Ohio Ct. App., Stark County June 26, 2007) ("Generally, issues regarding malice, bad faith, and wanton or reckless behavior are questions presented to the jury." (citing *id.*)). "Where the evidence in the record does not suggest a material factual issue on the question of reckless or willful or wanton misconduct, [it] is perfectly proper to determine the case by means of summary judgment," however. *Garrison v. Bobbitt*, 134 Ohio App.3d 373, 385 (Ohio App. 2 Dist. 1999) (citing *Fabrey*, 70 Ohio St. 3d at 356) (brackets in original).

Keeping the recklessness standard in mind, the Court will now assess each Defendant official's individual conduct. If the evidence, viewed in the light most favorable to the Plaintiffs, fails to demonstrate a genuine issue of material fact as to whether an individual Defendant was reckless, the Court must grant summary judgment for that Defendant based on statutory immunity. *Cabaniss v. City of Riverside*, 497 F. Supp. 2d 862, 895 (S.D. Ohio 2006).

### i. William Wervey

As previously mentioned, the City's Building Commissioner, William Wervey, sent a letter

on April 6, 2007, to the Common Pleas Court, labeling the Plaintiffs' house vacant and abandoned, in an attempt to expedite foreclosure proceedings. Plaintiffs assert that Wervey's conduct, in purported contravention of the City Ordinance's 30-day notice requirement, was reckless and caused all three state law torts.

Assuming for the moment that Wervey's actions did violate Chapter 1371 of the building code, his conduct still could not be characterized as "reckless." The only foreseeable risk from Wervey sending such a letter was that the foreclosure proceedings might be accelerated improperly, resulting in a homeowner being ejected more quickly from an occupied house. While this is certainly a risk, it does not rise to the level of an unreasonable risk of <u>physical harm</u> to another, which is required to find recklessness. *See Miller v. Cent. Ohio Crime Stoppers, Inc.*, 2008 Ohio 1280, P27 (Ohio Ct. App., Franklin County Mar. 20, 2008) ("the actor must be aware his or her conduct will probably result in injury." (internal citation omitted)). Under the worst case scenario – someone being rendered completely homeless – injury could potentially occur, but there are far too many factors that would have to align before one could conclude that physical harm would be the likely result of an accelerated foreclosure process. Once again, moreover, when Wervey wrote the letter, he was aware that the Common Pleas Court's procedure is one that gives homeowners notice that foreclosure proceedings are being expedited due to a house-vacancy determination. (Doc. 62-1 at 5.) He knew, accordingly, that, if his opinion as to the vacancy on the Mountview property were wrong, the homeowner would have the opportunity to challenge that determination and prevent acceleration of the foreclosure proceeding.

Simply, Wervey did not act with a perverse disregard to any known risk of injury by sending the letter. Based on the information available to him at the time, his conduct was, at worst, careless,

and the standard for recklessness "clearly implies something more than simple carelessness." *Byrd v. Kirby*, 2005 Ohio 1261, P27 (Ohio Ct. App., Franklin County Mar. 22, 2005) (citing *Poe v. Hamilton*, 56 Ohio App.3d 137, 138 (Ohio Ct. App., Warren County 1990)).  Because his actions were not reckless, Wervey is entitled to statutory immunity.  Accordingly, the Court **GRANTS** Wervey summary judgment as to all three state law torts – Counts 3, 4, and 5.[17]

ii.      **John Berdysz, Brad Buntura, and Mike Kristof**

Plaintiffs assert that John Berdysz, Brad Buntura, and Mike Kristof acted recklessly by entering Plaintiffs' house without verifying the authority of the James Secure caller and by allegedly poisoning their pet cats.  These distinct acts – the entry into the house and the alleged killing of the cats – must be addressed separately.

Defendants entered the Farinacci house based on a phone call from Rayfield James.  While not verifying the caller's authority may have been sloppy, it was certainly not reckless.  *See Byrd*, 2005 Ohio 1261, P27 (The standard for recklessness requires conduct beyond mere carelessness.); *cf. Miller*, 2008 Ohio 1280, P31 (Even if an officer failed to call to verify the accuracy of a warrant before disclosing the information it contained, because he did not know that the warrant was likely inaccurate, the officer did not act recklessly).  Furthermore, Defendants did, in fact, receive proper third-party consent to enter the house by receiving the call, as explained above.  Therefore, they did not act recklessly and there is no genuine issue of material fact with respect to their conduct in

---

[17]As explained above, moreover, Wervey's actions were not the proximate cause of the alleged injuries – i.e., Defendants entry into the house and their actions within the house.  Thus, even without statutory immunity, summary judgment would have to be **GRANTED** on the alternative grounds that Wervey was not the proximate cause of any of the alleged state law torts.

entering the Plaintiffs' house.[18]  Accordingly, statutory immunity applies and summary judgment

must be **GRANTED** to John Berdysz, Brad Buntura, and Mike Kristof for all state claims premised

on their mere entry into the house.

With respect to the cats' deaths, whether the Defendants killed the cats is a disputed issue

of fact.  To determine whether statutory immunity applies to claims premised on the deaths of the

cats, the Court assesses (1) whether there is a genuine issue of fact regarding the Defendants'

involvement in those deaths, and (2) whether that fact is material to the issue of Defendants'

recklessness.

A genuine issue of fact exists when, considering all of the evidence in the light most

favorable to the non-moving party, "reasonable jurors could find by a preponderance of the evidence

that the [non-moving party] is entitled to a verdict." *Anderson*, 398 U.S. at 252.  Here, Plaintiffs

have presented no direct evidence demonstrating that the Defendants killed their cats.  Plaintiffs

instead ask the Court to infer that Defendants caused the cats' deaths from certain circumstantial

evidence to which they point.

Construing the evidence in the light most favorable to the Plaintiffs, the record shows the

following: Defendants placed live traps inside the Plaintiffs' house attempting to capture and remove

the cats in April.  (Doc. 59-1 at 17-18.)  Berdysz stated during his deposition that he never reentered

the house again after that first visit.  (Doc. 51-7 at 2.)  Kim Farinacci freed the cats that same day and

took some of the traps out of the house.  (Doc. 59-1 at 4.)  Buntura returned to the house to discover

---

[18]Plaintiffs repeatedly mention their belief that the house was locked when the individual
Defendants entered it, arguing that this fact should have alerted the Defendants to the fact that
James did not have sufficient control over the property to authorize entry.  Again, because James
*did* have actual authority to enter the premises *and* to authorize City officials to do so, the fact
that locks perhaps should have induced the Defendants to question James' authority more
carefully is irrelevant.

that some of the traps had been taken, and subsequently, removed the remaining traps.  (Doc. 59-1 at 26.)  Kim Farinacci went to the house after these April events regularly to feed the cats, finding them "healthy."  (Doc. 59-1 at 4.)  In July, she returned to the house once again and discovered that the cats were dead.  *Id.*  Kim Farinacci claims that, at some point prior to July, she had a conversation with an unnamed police officer who "threatened to kill the cats if [she] was not able to remove them." *Id.*

As Defendants point out, the Plaintiffs do not know how the cats died (Doc. 51-12 at 2) and have proffered no direct evidence showing that any of the Defendants entered the property at any time after early April 2007.  The only evidence offered that links the Defendants to the deaths of the cats is the fact that the Defendants entered the Farinacci house three months before the cats were found dead.  Yet, even then, the Defendants tried to trap the cats alive. (Doc. 59-1 at 17-18.)  There is no indication that they wanted to kill the cats – only that they wanted them humanely removed from the premises.  Kim Farinacci's reference to an unknown police officer threatening the cats at an unknown time is insufficient to support a reasonable inference that the Defendant City officials named here killed the cats.  Plaintiffs have presented no evidence, moreover, showing that the cats were poisoned – i.e., no autopsies of the cats nor any chemical testing of the premises were performed.  There is also no evidence that the cats died "simultaneously."  As Plaintiffs admit, Kim Farinacci was not at the house every day during the three-month period and she apparently did not know the precise number of cats at the premises during the relevant time frame.  Given the deplorable conditions in which the cats lived, many other causes could have killed the cats.  While one might argue that purposefully poisoning cats would be sufficiently reckless to overcome a

statutory immunity defense, there is simply no evidence in the record from which one could reasonably infer that occurred.[19]

Evaluating the record, including the circumstantial evidence, in the light most favorable to the Plaintiffs, there is simply no evidence showing that Defendants caused the deaths of the Plaintiffs' cats; the record is devoid of any evidence upon which such an inference could reasonably be drawn.  Having found no genuine issue of material fact regarding recklessness, state law statutory immunity applies.  Accordingly, with respect to all state law claims premised on the deaths of the cats, summary judgment is **<u>GRANTED</u>** to John Berdysz, Brad Buntura, and Mike Kristof.

### iii.    Tim McLaughlin and John Becony

Plaintiffs assert that statutory immunity does not shield Tim McLaughlin and John Becony from liability because they acted recklessly in connection with the entry into the Mountview house. Their allegedly reckless conduct includes: (1) the failure of both to verify the authority of the James Secure caller, (2) Becony's alleged failure to properly supervise the City employees' entry into the Plaintiffs' house, and (3) the fact that Becony did not discipline Buntura after the incident.  (Doc. 59 at 11-12.)

---

[19]If there were a genuine issue of fact with respect to the deaths of the cats, that fact would arguably be material to the recklessness of Defendants' conduct.  Some courts have denied officials immunity for killing pets, albeit in substantially more egregious circumstances.  *See Brown v. Muhlenberg Twp.*, 269 F.3d 205, 218-219 (3d Cir. 2001) (Officer who "attempted to fire five bullets into the pet within the owner's view and without justification" was "not entitled to sovereign immunity under state law . . . because the record will support a conclusion that he acted intentionally"); *cf. Fuller v. Vines*, 36 F.3d 65, 66 (9th Cir. 1994) (Officers shot a dog twice in the owner's presence, killing it.  The Court found that the plaintiffs had "adequately alleged a cause of action under the Fourth Amendment for the killing of their dog.").  The Court does not reach this issue.

Analyzing McLaughlin's and Becony's conduct under the high standard for recklessness,[20] neither one acted recklessly.  With respect to the first accusation – that McLaughlin and Becony failed to verify the authority of the James Secure caller – the only known risk from that failure was that the house might be entered without proper consent.  As explained above, while the failure to verify may have been sloppy, it certainly does not amount to recklessness.  *See Byrd*, 2005 Ohio 1261, P27; *cf. Miller*, 2008 Ohio 1280, P31.  It also was not causally related to any harm Plaintiffs suffered moreover: had they verified Mr. James' authority, they would have discovered that it was, in fact, valid.  Thus, while the act of verification may have slightly delayed entry into the home, it would not have prevented it.

As to the other two claims – the failure to supervise and failure to discipline, the Court does not find that Becony acted with a perverse disregard of a known risk of physical harm by failing to supervise or failing to discipline in this instance.  *See Fabrey*, 70 Ohio St. 3d at 356.  As mentioned above, there was no risk of harm to persons from the entry into the home and there is nothing in the record to indicate that there was any risk of harm to even the cats as of that point in time.  Therefore, finding no genuine issue of material fact as to the recklessness of McLaughlin's and Becony's conduct, state statutory immunity applies.  Accordingly, Defendants' motion for summary judgment is **<u>GRANTED</u>** to McLaughlin and Becony with respect to all three state law claims.

### c.    Alternative Grounds for Summary Judgment

In the alternative, even if the Court had found a genuine issue of material fact regarding the recklessness of any individual Defendants' conduct, the underlying merits of Plaintiffs' three state

---

[20]Recklessness requires "not only that [defendant's] conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent."  *O'Toole*, 118 Ohio St. 3d at 386.

law claims nevertheless fail.  First, for trespass, Plaintiffs must prove "(1) an unauthorized intentional act, and (2) entry upon land in the possession of another."  *Brown v. County Comm'rs*, 87 Ohio App. 3d 704, 716 (Ohio Ct. App., Scioto County 1993).  Because Defendants had proper third-party consent through James Secure, not only was there no Fourth Amendment violation, there also was no "unauthorized" entry.  Without the "unauthorized entry" element, Plaintiffs' trespass claim and any underlying damages based on that claim, including damages arising from the deaths of the cats, cannot be recovered.

Second, Plaintiffs' invasion of privacy claim requires an intentional intrusion, "physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns," and that the "intrusion would be highly offensive to a reasonable person." *Sustin v. Fee*, 69 Ohio St. 2d 143, 145 (1982).  Here, Plaintiffs no longer lived at the house, knew that the property was in foreclosure proceedings, and knew that Sandra Farinacci had signed the mortgage containing the property preservation provisions and that the property was in a state of disrepair.  A reasonable person would not be highly offended by the entry into their essentially "abandoned" house by property preservation specialists and those acting on their behalf; such conduct cannot be characterized as so unreasonable as to cause outrage.  Also, Plaintiffs' invasion of privacy claim is not based in any manner upon the killing of the cats (Doc. 38 at 10-11); thus, if the Court had found a genuine issue specifically as to the deaths of the cats, that fact would have been immaterial to the invasion of privacy claim.

Third, Plaintiffs' intentional infliction of emotional distress (IIED) claim fails because Ohio appears not to recognize such a claim based on the death of one's pet.  Under Ohio law, animals – including pets – are still considered property, and Ohio does not recognize negligent infliction of emotional distress claims premised on the injury to one's property.  *Ullmann v. Duffus*, 2005 Ohio

6060, P30 (Ohio Ct. App., Franklin County Nov. 15, 2005) (quoting *Strawser v. Wright*, 80 Ohio App. 3d 751, 754-755 (Ohio Ct. App., Preble County 1992)).  Two Ohio cases – *Langford v. Emergency Pet Clinic*, 96 Ohio App.3d 174 (Ohio Ct. App., Cuyahoga County 1994) and *Oberschlake v. Veterinary Assocs. Animal Hosp.*, 151 Ohio App. 3d 741, 745-746 (Ohio Ct. App., Greene County 2003) – have implied that IIED damages might be recoverable under limited circumstances for the injury to one's pet.  Neither case, nor any other Ohio case located by this Court, has actually awarded emotional distress damages for a pet's death or injury, however.  In any event, no IIED claim can persist here because neither Plaintiff witnessed the alleged tort being committed against their cats – a third-party.  *See Jylanki v. Chaaouane*, No. 6-194, 1978 Ohio App. LEXIS 10608, at *3 (Ohio Ct. App., Lake County Mar. 13, 1978) (unpublished) (IIED claim for tort committed against a third person requires that "the conduct must be directed at a member of the aggrieved person's immediate family who was present at the time or any other person present if the distress did result in bodily harm." (citing Restatement of Torts 2nd §46)).

Thus, even if there were a genuine issue of material fact as to recklessness, there is no genuine issue of material fact as to the merits of Plaintiffs' three state law claims; Defendants are entitled to judgment as a matter of law.  Accordingly, with respect to Counts 3, 4, and 5, the Court would **GRANT** Defendants' motion for summary judgment on these alternative grounds, as well.

## III.   CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 51) is **GRANTED** in its entirety.  Defendants' Motion to Dismiss the John Doe defendant, pursuant to Federal Rule of Civil Procedure 4(m), is also **GRANTED**, for the reasons articulated above.

**IT IS SO ORDERED.**

-32-

s/Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: March 30, 2010**

-33-